IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WAYNE GARDNER, JR., as Special Administrator of the Estate of Wayne Gardner, Sr., Deceased,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 03 C 8825<br><br>HONORABLE DAVID H. COAR |

**MEMORANDUM OPINION AND ORDER**

Wayne Gardner, Jr. ("Plaintiff"), the special administrator of the estate of his father Wayne Gardner, Sr. ("Gardner") filed a complaint against the United States of America. In the three-count complaint, Plaintiff alleged medical negligence in violation of the Federal Tort Claims Act, 28 U.S.C. §1346(b), §§ 2671-2680; a state law claim of wrongful death pursuant to the Illinois Wrongful Death Act, 740 ILCS 190/1 et seq; and a request for a damages award of $15,910,000 in light of "res ipsa loquitor."

Counsel submitted, and this Court reviewed, pretrial proposed findings of fact and conclusions of law. The parties proceeded to bench trial on April 4, 2005. This Court heard evidence from both parties. Based on the pretrial submissions and the evidence at trial, this Court makes the following findings of fact and conclusions of law. To the extent that any findings may be deemed conclusions of law, they shall also be considered conclusions. To the

-1-

extent that any conclusions may be deemed findings of fact, they shall also be considered findings. *See Miller v. Fenton*, 474 U.S. 104, 113-114 (1985).

**FINDINGS OF FACT**

*October 26, 1999 surgery*

1. In 1999, Gardner sought treatment at Hines V.A. Hospital for an infra-renal abdominal aortic aneurysm repair. The surgery, which was the first of the set of series of surgeries in his abdomen that are relevant to this litigation, took place on October 26,1999.

2. The individuals involved in the October 26, 1999 surgery were resident surgeon Suzanne Wooloson, attending surgeon Fred Littooy, second assistant surgeon Pamela Hodul, nurse Erlinda Fernandez, nurse Barbara Miller, and nurse Brenda Boston.

3. Dr. Woloson was completing her fellowship at Loyola during the time of Gardner's surgeries. Prior to that, she had completed a general surgery residency at the University of Chicago hospitals. She had completed between forty and fifty AAA surgeries.

4. Dr. Littooy was the supervising surgeon during the October 26, 1999 and November 12, 1999 surgeries. He is the chief of the division of vascular surgery at Hines and is a professor of surgery at Loyola Medical School. He has been teaching surgery for approximately twenty eight years. He had completed between roughly three hundred and four hundred AAA surgeries.

5. Gardner had an abdominal aortic aneurysm (AAA) over 5 cm in size.

6. When a AAA is over 5 cm in size, the benefits of undergoing a AAA repair operation outweigh the risks involved with surgery. If the operation is not carried out, there is a likelihood that the AAA will burst.

7. The parties agree that completing a AAA surgery was the proper course of action.

8. During a AAA repair, surgeons must move parts of the body that obstruct or impede access to the AAA. Some organs, for example, are moved out of the way and held in place by retractors.

9. In this case, the duodenum was moved. The duodenum is the portion of the small intestine closest to the stomach.

10. Dr. Woloson's operative report states that the first portion of the duodenum was mobilized off the anterior surface of the aneurysm, using retractors and that this was done "with care to avoid injuring its blood supply."

11. Neither Dr. Littooy nor Dr. Woloson recall any injury to the duodenum during this mobilization.

12. In order to access the aorta, they also ligated the renal vein, which was located near the duodenum.

13. Dr. Woloson's report does not note that any major problems occurred during the surgery. Dr. Littooy signed off on Dr. Woloson's report. He found that report consistent with is recollections of the October 26, 1999 surgery.

14. Aside from a period of atrial fibrillation that was resolved during the post-operation recovery period, no other irregularities were reported.

15. Dr. Woloson testified that she did not recall the October 26, 1999 surgery because it was a typical procedure.

16. Dr. Littooy testified that he did recall the surgery and that there were no complications or injuries during it.

17. According to the report, "The patient tolerated the procedure well...and [was] taken to postanesthesia recovery in stable condition."

18. Dr. Littooy also signed a report that stated that the surgery was completed, that Gardner's course was "unremarkable" and that the atrial fibrillation was resolved during the post-operation recovery period.

19. A post-operative report states that on day three after the surgery, Gardner produced dark brown liquid stool and passed gas. Bowel sounds were present. During recovery he also felt hungry and was advanced to a general diet.

20. After a bowel movement on November 2, 1999, Gardner went home.

21. Dr. Woloson stated that based on her interpretation of the medical records, Gardner recovered from the AAA exactly as expected and his bowel function returned when it was expected to return.

22. Dr. Woloson testified that if the bowel had been nicked, she believed that Gardner would not have recovered from surgery in the manner that he did. Dr. Woloson stated that if the duodenum had been injured in the first surgery, the content in Gardner's abdomen would have been bilious rather than fecal, the location of the abscess would have been more centralized, and Gardner would not have recovered from his original surgery and returned two and a half weeks later with this problem.

23. Dr. Woloson testified that she has never nicked a bowel.

24. Dr. Littooy testified that there was no evidence of a nicked duodenum during the surgery or after.

25. Dr. Littooy said that if there had been an injury to the duodenum, it would have been quite clear during the days following the surgery.

26. Instead, he said, on November 12, 1999, Gardner presented a ruptured appendix that led to the infection.

*November 12, 1999 Surgery*

27. Gardner returned to Hines on November 11, 1999, complaining of abdominal pain and constipation.

28. That night, he had three bowel movements.

29. The next day, Dr. Littooy performed an exploratory surgery on Gardner. Dr. Woloson was present at the surgery, but did not assist.

30. When Dr. Littooy carried out the exploratory surgery on November 12, 1999, he observed that the appendix was behind the colon and near the aortic graft.

31. There was evidence of a perforation or hole at the end of the appendix, according to Dr. Littooy and Dr. Woloson. Dr. James Bergin, chief resident, noted in his report that the appendiceal tip had been perforated.

32. Dr. Littooy found the dislocated tip of Gardner's appendix during the surgery.

33. He also noticed a very large abcess related to perforated appendix.

34. A collection of foul smelling material was in the abdomen and covering the graft.

35. Dr. Littooy testified that the material was consistent with that from a ruptured appendix, rather than the type of material that would be emitted from the duodenum.

36. He drained between between one and two liters of foul smelling fluid from Gardner's body. He irrigated the graft area.

37. Gram negative bacteria was found in the area.

38. Dr. Littooy concluded that Gardner was suffering from appendicitis and had an abdominal abscess and an infected aortic graft.

39. Dr. Bergin's report states that the surgeons, both general and vascular, conferred as to the "all options, risks, and benefits of each procedure" and decided to carry out an appendectomy but wait 48 hours to remove the aortic graft.

40. An appendectomy was performed. In addition, an incision was made and the abscess was drained. The surgeons irrigated the area.

41. Dr. Bergin concluded in his report that Gardner "tolerated the procedure well."

42. Dr. Littooy said he found no evidence of an injured duodenum during the November 12, 1999 surgery. Dr. Littooy testified that he was looking right at the duodenum during the surgery.

43. Both sides agree that the doctors involved in the November 12, 1999 surgery did not breach a standard of care.

44. A pathology report of that surgery stated that the pathologist's diagnosis was acute and subacute periappendicitis with inflammation of the wall. The report also stated that the lumen was occluded.

*November 15, 1999 Surgery*

45. The infected graft was removed and the aorta repaired during Gardner's third surgery, which took place on November 15, 1999.

46. Neither Dr. Woloson nor Dr. Littooy was present for this surgery

47. During the first part of that surgery, Plaintiff's blood flow was redirected. A killofemoral bypass and a femoral-femoral bypass were performed.

48. The duodenum, after being exposed to air, adhered to the aorta.

49. The duodenum was separated from the aorta so that the graft could be removed.

50. The graft was removed.

51. After the aorta was repaired, the vascular surgeons undertaking the surgery realized that Gardner's bowel had been perforated and that there was a large area of injury to a portion of the duodenum.

52. Dr. Andrus, a general surgeon, was consulted. He carried out a repair to the duodenum immediately.

*Additional Medical Procedures*

53. Gardner's condition worsened, and he underwent a fourth surgery on December 3, 1999. This surgery was undertaken with the goal of wound debridement, exploration and suture removal.

54. On December 14, 1999, an abscess located anterior and inferior to the previous aortic graft was drained.

55. On February 10, 2000, Gardner had another surgery due to upper gastrointestinal bleeding and a gangrenous gall bladder. Blood found in his abdomen was attributed to a bleeding of the third portion of the abdomen.

56. On March 16, 2000, Gardner underwent the final surgery that is relevant to this case. It appears that the reason for the surgery was that Gardner was suffering from major bleeding. The final surgery left him with an open abdominal wall wound.

*Gardner's Death*

57. Approximately three years later, on February 9, 2003, Gardner died.

58. He died because of an aortal blowout that was related to the 1999 infection of his aortic graft.

**Trial Testimony**

*Plaintiff's Family*

59. Gardner's son indicated that his father complained of abdominal pain when he was discharged after the October 26, 1999 surgery. Gardner's son also noted that his father complained of being constipated and of having blood in his stool after the surgery.

60. Members of Gardner's family testified at trial that after the November 15, 1999 surgery Dr. Andrus told them that it looked like Gardner's small intestine had been nicked during the first surgery.

61. Gardner's son and Sharon Kress both testified that Dr. Andrus told them that it looked like someone had taken a blow torch to Gardner and burned his intestines.

62. Donna Meredith testified that Dr. Andrus told her that there had been a small nick near Gardner's appendix and that it probably infected the appendix. She stated that during this conversation, which took place in the surgical waiting room, Dr. Andrus said that a student did the original surgery and that the nick was a mistake.

63. The family members testified that they had been told it did not look as though Gardner would survive the night.

*Plaintiff's Expert Dr. Joseph S. Carey*

64. Dr. Joseph S. Carey, a board-certified cardiothoracic surgeon, gave a deposition on behalf of Plaintiff.

65. Dr. Carey has been in private practice since 1983. He has been on staff at Torrance Memorial Hospital and Little Company of Mary hospital for twenty years. For sixteen years he was chief of thoracic surgery at the VA hospital in West Los Angeles. He also is a clinical associate professor of surgery at UCLA.

66. Dr. Carey has been named as a defendant in four lawsuits. All of the suits were settled.

67. He has not written any publications that are related to the issues in this case. The last time he performed a AAA surgery was approximately five years before his deposition on March 31, 2005.

68. That deposition was read into the record during trial.

69. Dr. Carey's deposition testimony focused on how Dr. Woloson and Dr. Littooy could be held responsible for negligence during the October 26, 1999 surgery and how their breach of the standard of care could have led to the aortic infection that eventually led to Gardner's death.

70. Dr. Carey stated that the infection of the aortic graft could have been caused by injury to the duodenum. When asked if there were any breaches of the standard of care related to the October 26, 1999 surgery, Dr. Carey "Yes. I think that somehow there was an injury to the duodenum there."

71. Dr. Carey presented three possible ways in which Dr. Woloson and Dr. Littooy could have breached the standard of care during the October 26, 1999 surgery. In each case, he stated that the surgeons breached the standard of care when "somehow there was an injury to the duodenum" that the surgeons failed to recognize.

72. First, he stated that it was possible that the duodenum was torn during the surgery.

73. He then continued with a second possibility: "the injury to the duodenum might also have been not a frank perforation." He explained that the surgeons had difficulty finding room to work near the aneurysm and so had to work in the area of the duodenum. He stated, "They were concerned about that, and they mentioned in the operative report that they were taking care to avoid any injury to that blood supply to the duodenum." The injury could have occurred "despite their attempts to avoid it" and, he noted in the case of a retraction injury, "of course, that might have been difficult to recognize at that time."

74. In addition, he noted a third possibility: the injury could have been caused by sutures from the graft that were in contact with the duodenum.

75. Dr. Carey also outlined the steps that he felt the doctors should have taken: examination of the bowel, taking care to avoid injury by the retractors (the devices which held the duodenum out of the way during the surgery), and avoiding placing sutures too deep into the bowel when sewing the aorta and duodenum together at the end of the surgery.

76. He stated that they should have inspected the surgical area and made sure there were no unrecognized injuries at the end of the procedure.

77. When asked if it was his opinion that the surgeons did not take those steps, he responded: "Didn't do it adequately. They did take some steps. They did mention in the op report that they were trying to avoid injury to the duodenum."

78. He explained that he believed they were not careful in placing the retractors because "It is the potential source of injury. And since we find that the duodenum subsequently fell apart and had to be removed, then that is the evidence for the injury."

79. Dr. Carey testified that he felt the eventual infection in the aorta was caused by the duodenal injury and subsequent leakage of its contents.

80. He did not believe the infection could have been related to any other cause, such as a burst appendix. He added that based on his reading of the pathology report, the appendix did not burst.

81. Instead, he stated that he believed that the appendix was blocked ad so could not have leaked any fecal contents into the abdominal cavity.

82. He testified that it was extremely unlikely that the appendicitis led to the infection of the graft because there were only five cases reported where that happened and they were all "late occurrences, several months or years later."

83. As for why the duodenum would be a more likely cause of the infection, he said, "the duodenum sits right on top of the aneurysm and it is a far more common complication to have duodenal injury, duodenal fistula, which is right on top of the aorta."

84. He later stated: " I would say that massive injury to the duodenum is an extremely unlikely and unusual event."

85. When asked about the November 15, 1999 surgery, Carey said that the "the only breach there is that they aggravated the duodenal injury by whatever retractors or whatever rummaging around they did in there to create such an extensive injury to the duodenum. However, as I say, in my opinion much of the duodenal injury was probably established by that time."

*Defendant's Expert Dr. Bruce Gewertz*

86. Dr. Gewertz, a board certified vascular surgeon, testified on behalf of the defendant. Dr. Gewertz has been practicing since 1977.

87. He is currently the chairman of the Department of Surgery at the University of Chicago and director of the vascular surgery board of the American Board of Surgery. He has been an editor of various medical journals, and is currently on the editorial board of *Contemporary Surgery*.

88. Dr. Gewertz has been named a defendant in three lawsuits. One was dismissed for lack of validity. Another was settled. He was dismissed as a defendant in the third lawsuit.

89. Dr. Gewertz has published a number of works related to the aorta. Works related to this case include an article titled "Appendicitis and the Aortofemoral Graft Infection," and two books that included chapters on aortic graft infections.

90. He testified that he has completed between 500 and 1000 AAA surgeries in his career.

91. Dr. Gewertz testified that he found "no evidence whatsoever" that the duodenum was injured during the October 26, 1999 surgery.

92. He saw no evidence that the duodenum was nicked.

93. When asked whether the duodenum could have been bruised, he said that there was no evidence for that possibility "other than the fact that someone could imagine that it happened." He said that he thought it was "highly, highly unlikely" that the duodenum was bruised.

94. As for the theory that the sutures were placed to deep in the aneurysm and thereby injured the duodenum, he said he had never heard of such a complication.

95. Dr. Gewertz also testified that the evidence indicated that the duodenum was not injured. If the duodenum had been injured, Dr. Gewertz said, "postoperative recovery from that initial surgery would have been very poor." Gewertz explained that Gardner would not have been able to eat, he would have vomited, and would not have had the recovery that the medical records suggest he had.

96. In short, Gewertz felt that the October 26, 1999 surgery was successful and uneventful.

97. He found no injury to the duodenum and no breach of the standard of care.

98. Dr. Gewertz instead traced the infection of the graft to Gardner's appendicitis.

99. He explained, "The course of this case, if you examine it, now that have we all the records as well as the unfortunate outcome...it clearly shows that the patient presented with a perforated appendix, that the perforated appendix infected the aortic graft, that in removing the aortic graft the duodenum was injured."

100. Gewertz cited several reasons for why he thought the appendicitis was the likely cause of the infection: the infection bacteria was similar to gram negative bacteria in the appendix rather

than the types of bacteria found in the duodenum, the observations that the appendix was perforated, and the course of Gardner's progress. He stated that he had been involved in cases involving appendicitis and that the path report was "exactly the path report you get for taking out a perforated appendix." He equated ruptured with perforated.

101. He added that the duodenum, which was moved out of the way during the first surgery, had formed an adhesion to the aorta by the third surgery due to exposure to air. He concluded that it was "obvious" that the duodenum was injured only when it had to be separated and moved for the third surgery.

**CONCLUSIONS OF LAW**

The FTCA provides a remedy for personal injury caused by the negligent or wrongful act or omission of government employees acting within the scope of employment. The government is liable in the same manner and to the same extent as a private individual. 28 U.S.C. §§1346(b), 2671, 2674.

Under the FTCA, the issue of liability is determined in accordance with the substantive law of the state where the action arose. *Midwest Knitting v. United States*, 950 F.2d 1295, 1297 (7th Cir. 1991). This action arose in Illinois; consequently this Court will apply Illinois law.

In Illinois, expert testimony establishes each element of negligence in a medical malpractice case. *Ramos v. Pyatti*, 534 N.E.2d 472, 475 (Ill.App.Ct.1989). In order to prevail, a plaintiff in a medical malpractice case must prove a) the standard of care by which the physician's treatment is measured; b) a deviation from that standard; c) that the deviation was the proximate cause of plaintiff's injury. *Chambers v. Ingram*, 85 F.3d 351, 355 (7th Cir. 1998).

With respect to the standard of care prong of the analysis, Illinois law "requires a physician to possess and to apply that degree of knowledge, skill, and care which a reasonably well-qualified physician in the same or similar community would bring to a similar case under similar circumstances." *Campbell v. U.S.,* 904 F.2d 1188, 1191 -1192 (7th Cir. 1990)(citation omitted.

The standard of care against which a physician's conduct is measured is not the highest degree of skill possible. Instead, this Court considers whether the physician used the same level of skill–a reasonable level–that a physician in good standing in the community would use under similar circumstances. *Newell v. Corres*, 466 N.E.2d 1085, 1089 (Ill.App.Ct. 1984). Where expert testimony demonstrates that alternative methods of treatment are both proper under the circumstances, and injury results from the one that the physician chose, deviation is not inferred from that fact. *See Newell*, 466 N.E.2d at 1089. "[T]he mere fact that an operation does not result in a favorable outcome does not establish–or even constitute evidence of–a deviation from the standard of case." *Campbell*, 904 F.2d at 1193.

As for proving proximate cause, Illinois courts have held that proximate cause is not established where the causal connection is "contingent, speculative, or merely possible." *Krivanec v. Abramowitz,* 851 N.E.2d 849, 856 (Ill.App.Ct. 2006). Instead, "[t]he proximate cause element of a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty." *Id.,* 851 N.E.2d at 854 (Ill.App.Ct. 2006)(citing *Northern Trust Co. v. University of Chicago Hospitals & Clinics,* 821 N.E.2d 757, 768 (Ill. App. Ct. 2004) (absent expert testimony that defendant's negligent acts caused the injuries within a reasonable degree of medical certainty, a verdict in plaintiff's favor cannot stand)).

Plaintiff fails to establish that the physicians in this case were even responsible for any injury to Gardner, let alone that such an injury was the result of a breach of the standard of care. Plaintiff relies on Dr. Carey's assessment that the duodenum was injured because it could have been injured and because there was an eventual infection. In light of weaknesses in Dr. Carey's testimony, and the strength of the evidence presented by Defendant, this Court concludes that Plaintiff has failed to prove that the duodenum was injured and that the surgeons breached the standard of care.

As a preliminary matter, this Court disagrees with Dr. Carey's conclusion that "somehow there was an injury to the duodenum" during the October 26, 1999 surgery.

Dr. Carey reasons that the duodenum must have been injured because Plaintiff's graft was eventually infected. Given that the task of this Court is to determine what caused the infection, a conclusion that there must have been a duodenal injury because there was an infection is not helpful.

Plaintiff contends that even had Gardner's duodenum been injured in the October 26, 1999 surgery, the injury might not have manifested itself until later. After reviewing the medical reports and hearing the expert testimony on the matter, this Court disagrees. If indeed the duodenum appeared as though someone had taken a blowtorch to it, it is unlikely that Gardner would have been recovering from the October 26, 1999 surgery in the manner that the notes and testimony suggest he was recovering.[1] The facts presented at trial support the conclusion that

---

[1]While Gardner's son did indicate that his father complained of abdominal pain when he was discharged, that pain alone is not sufficient to suggest that the duodenum had been nicked. Gardner had, after all, just had surgery. Gardner's son also noted that his father complained of being constipated and of having blood in his stool. Other than that statement, there is no indication that the medical reports were incorrect or that the duodenum could have been nicked during the first surgery. Moreover, even those statements may not indicate that the duodenum

Gardner was recovering from that surgery–he had bowel movements, passed gas, and experienced hunger. By the time he was discharged, he was eating a general diet.

Dr. Gewertz's explanation–if the duodenum had been nicked during the October 26, 1999 surgery in a negligent manner, Gardner would have gotten very sick soon after– is more credible than Dr. Carey's hypotheses that one of three possible methods of injury occurred during that surgery.

The other evidence Plaintiff provides in support of a duodenal injury is the hospital conversations between Dr. Andrus and Gardner's family. Dr. Andrus did not testify in this case. Even assuming that Dr. Andrus did in fact tell the family members of a patient recovering from surgery that it looked like a blowtorch had been taken to their loved one's insides and led them to believe that a student was responsible for a nick that probably infected the patient's intestine–an event this Court finds unlikely–the evidence in this case does not support the conclusion that the duodenum was injured during the October 26, 1999 surgery. Dr. Andrus was not present for the initial surgery. He was called during the November 15, 1999 operation. His report after the operation does not establish that he felt that the duodenum was damaged in the October 26, 1999 surgery and, in light of the evidence suggesting otherwise, is not sufficient to convince this Court that the duodenum was injured. Any linkage between Andrus' statements to the family and Gardner's eventual demise is speculative.

---

had been nicked: Plaintiff did not offer credible expert testimony suggesting that the symptoms Gardner allegedly complained of could be linked to a nicked duodenum.

While it does appear that the graft infection was caused by the appendicitis, this Court is not tasked with finding the actual cause of infection.[2] It is sufficient to note that Plaintiff fails to establish that the graft blowout resulted from an infection linked to a nick in the duodenum during the October 26, 1999 surgery

Plaintiff does not establish that there was a deviation from the standard of care by which the physicians' treatment in this case is measured. It is Plaintiff's burden to present expert testimony which enables a court to conclude that the physicians in this case did not possess and apply the degree of knowledge, skill, and care which reasonably well-qualified physicians would have done in the same or a similar case. While Plaintiff's expert claims there was a breach in the standard of care, he does not offer a credible explanation of how that breach occurred.

Even if the duodenum had been injured during the October 26, 1999 surgery–which does not appear to be the case, based on the evidence–Dr. Carey fails to establish that the physicians involved breach the standard of care with respect to that injury. Dr. Carey does not establish that a reasonably well-qualified physician in the same or similar community looking at the same or similar set of facts would have taken a different course of action with an injury. Instead, he suggests that any injury that did occur could have been difficult to recognize and could have occurred despite precautions taken by the physicians but that those physicians should still have been more careful.

---

[2] The government suggests that the eventual graft blowout occurred because of an infection that is linked to Gardner's appendicitis. Carey testified that there is no evidence that the appendix ruptured, but the medical report and Woloson's testimony–she saw the ruptured appendix and saw the surgeon locate its tip–suggest that it did. Carey's interpretation of the pathology report is unconvincing. This Court finds the Government's explanation credible.

Dr. Carey does state that he believes the injury was a breach of the standard of care and that "[i]t was a breach because it was not recognized." His own testimony, couched in multiple hypotheticals that are not particularly compelling, is inadequate support for that conclusion. Dr. Carey's explanation of how the surgeons breached the standard of care is no more illuminating than his explanation of how the duodenum was injured: he states that the surgeons did not take adequate care because the duodenum was injured. This Court is tasked with determining if the standard of care was breached: recounting that there was an injury does not help answer that question.

Dr. Carey's explanation that the doctors in the November 15, 1999 injury made the prior injury worse is unconvincing, in light of the evidence presented.

The evidence presented in this case establishes that the treating physicians did not breach the standard of care.[3] Plaintiff has failed to prove a breach and therefore has not met its burden. Cause in fact exists where there is a reasonable certainty that a defendant's acts caused the injury or damage. *First Springfield,* 720 N.E.2d 1068 (Ill. 1999). In this case, it has not been established that the doctors involved in the October 26, 1999 surgery even nicked the duodenum, let alone that the nick was a breach of the standard of care that led to an eventual infection of the aortic graft. Plaintiff's FTCA claims fails.

In light of Plaintiff's failure to establish that Gardner's death was the proximate result of one or more negligent acts or omissions by Defendants, its claims for recovery under the Illinois Wrongful Death Act and pursuant to "res ipsa loquitor" also fail.

---

[3] During trial, Plaintiff's counsel attempted to create an issue as to the reliability of the medical records. Other than eliciting testimony that there may have been errors as to immaterial information such as the exact time the surgeries began and ended, he failed to show that the records are unreliable.

## *CONCLUSION*

While the evidence at trial shows that Gardner, a man dear to his family, clearly suffered a great deal before his death, it does not establish that his death was in any way related to the actions of the surgeons involved in this case. After carefully reviewing the evidence in this case, this Court is forced to come to the conclusion that Plaintiff has failed to prove any claim in this case.

For the foregoing reasons, judgment is entered in Defendant's favor.

**Enter:**

**/s/ David H. Coar**

_____
**David H. Coar**
**United States District Judge**

**Dated: September 11, 2005**